**Eduoard Mac'AVOY, Plaintiff,**

v.

**THE SMITHSONIAN INSTITUTION, et al., Defendants.**

**Civ. A. No. 89–2033.**

United States District Court, District of Columbia.

Feb. 4, 1991.

Mark Fink, Thomas O. Kline, Thomas Starnes, Washington, D.C., for plaintiff.

Wilma A. Lewis, Asst. U.S. Atty., U.S. Atty's. Office, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Now before the Court is defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Upon consideration of this motion, the response in opposition to this motion, and the Smithsonian's reply, the Court shall grant the Smithsonian's motion to dismiss as to Counts III and V and grant summary judgment on behalf of

the defendants as to Counts I, II, IV and VI for the reasons set forth below.[1]

### STATEMENT OF THE CASE

This case concerns the rightful possession of certain paintings by the late artist Romaine Brooks which are currently in the possession of the Smithsonian.[2] The plaintiff alleges, under various theories, that all of the paintings in the Smithsonian's possession belong to him. He asks the Court to issue declaratory relief and demands the immediate return of these paintings along with nominal damages for the injury allegedly suffered due to their unlawful possession.

The essential issue of the plaintiff's case is whether Ms. Brooks' artwork, now in the possession of the Smithsonian, was a gift to the Smithsonian or a temporary loan. A review of the circumstances concerning each transfer of her artwork is, therefore, necessary.

On March 17, 1966, Romaine Brooks wrote to the Smithsonian confirming her intention to give five of her paintings to the Smithsonian: *Self Portrait; Girl with Green Ribbons; Dame en Deuil (La Veuve); Le Veste en Soie Verte;* and *Azalees Blanches.* By another letter dated May 3, 1966, Brooks agreed to send one additional painting, *Lady Troubridge,* to the Smithsonian.

On April 27, 1966, the plaintiff and Ms. Brooks executed an Act of Sale that allegedly conveyed to the plaintiff title to Ms. Brooks' two Nice apartments and the "meubles meublants" contained in the apartments. Attached to the Act of Sale was a list of eleven paintings and their prices. These paintings, allegedly, were included in the Act of Sale. The Act of Sale also stated that Ms. Brooks would enjoy the right to use and enjoy her apartments and their contents for so long as she lived. Ten of eleven paintings on the list attached to the Act of Sale are now in the possession of the Smithsonian.

On January 17, 1967, Dr. David Scott, director of the Smithsonian's National Collection of Fine Arts ("Museum"), wrote to Ms. Brooks, advising her of the Smithsonian's acceptance of the six paintings sent in March, 1966, and thanking her for the gift.

In March 1967, Dr. Scott visited Ms. Brooks at her home in France, where her paintings and drawings were kept on display or in storage in her studio. During this visit, Ms. Brooks allowed Dr. Scott to select additional works for the Museum. Dr. Scott understood from his communications with Ms. Brooks that it was her intent to give the Museum any of the paintings and drawings in her studio that he chose.

In September, 1967, Richard Wunder, Chief Curator of the Museum, visited Ms. Brooks in Italy and in France. During these visits, Dr. Wunder and Ms. Brooks discussed the paintings that Dr. Scott had selected for the Museum. Dr. Wunder understood from his communications with Ms. Brooks that it was her intention to give the Museum any of her paintings and drawings in her studio that it chose.

On January 27, 1968, Ms. Brooks wrote to the Smithsonian to advise that she had sent the paintings Dr. Scott chose, along with other paintings and drawings.

On or about March 13, 1968, the Museum received from Ms. Brooks fourteen paintings and six drawings. On September 5, 1968, Dr. Scott wrote to Ms. Brooks, advising her of the Smithsonian's acceptance of the fourteen paintings and six drawings and thanking her for the gift.

In September, 1968, Adelyn Breeskin, a Museum curator, visited Ms. Brooks at her home in France. During this meeting, Ms. Breeskin asked Ms. Brooks for additional paintings and drawings for the Museum's collection. In response to Ms. Breeskin's request, on September 21, 1968, Ms.

---

**1.** Also pending is Plaintiff's Motion for Partial Summary Judgment which the Court will not address given its holding on defendants' motion.

**2.** The National Gallery of Fine Art, the museum with which Ms. Brooks corresponded, is one of several museums functioning under the auspices of the Smithsonian Institution. For the sake of brevity, the Court shall refer to these museums collectively as "Smithsonian."

Brooks wrote to the Smithsonian to advise that she was sending thirty-five drawings.

On or about October 28, 1968, the Museum received the thirty-five drawings sent by Ms. Brooks.

On December 18, 1968, Dr. Scott wrote to Ms. Brooks, advising her of the Smithsonian's acceptance of the thirty-five drawings and thanking her for the gift.

On October 28, 1969, Ms. Brooks wrote to the Smithsonian to advise that she was sending two paintings that Ms. Breeskin had requested, along with one additional painting. On or about December 24, 1969, the Museum received the three paintings sent by Ms. Brooks. On June 2, 1970, the Museum director wrote to Ms. Brooks, advising her of the Smithsonian's acceptance of the three paintings and thanking her for the gift.

Beginning at least in May, 1968, and continuing until the present, the artworks have been exhibited to the public at the Smithsonian and other museums. The artworks have also been reproduced in several catalogs and other publications. Each publication is accompanied by a credit line noting that they were gifts to the Museum from the artist.

Romaine Brooks died in Nice, France, on December 17, 1970.

On June 1, 1983, Mr. Mac'Avoy wrote to the Museum claiming to be the owner of eleven of the artworks and demanding that they be returned to him. The plaintiff attached a copy of portions of the notarized Act of Sale between Mr. Mac'Avoy and Ms. Brooks, dated April 27, 1966. An appendix to the Act of Sale listed eleven paintings by Ms. Brooks, ten of which are in the possession of the Smithsonian.

On July 20, 1983, the Museum director responded to the plaintiff's letter, stating that the Smithsonian had in its possession and owned ten of the paintings he claimed, and that Ms. Brooks had given them to the Museum. The plaintiff's letter was then referred to the Smithsonian's Office of General Counsel.

On September 14, 1983, a Smithsonian lawyer wrote to the plaintiff confirming the Smithsonian's claim of ownership and forwarding documents establishing that claim.

The plaintiff never filed with the Smithsonian an administrative claim pursuant to the Federal Tort Claims Act.

On January 12, 1989, Mr. Olivier Schnerb, a French lawyer, wrote to the Museum on behalf of the plaintiff claiming that the plaintiff was the owner of eleven paintings by Romaine Brooks and demanding that the Museum return them to the plaintiff. The Smithsonian sent Mr. Schnerb a series of letters affirming its claim of ownership to the artwork.

This action, claiming title to all of the artwork now in the possession of the Smithsonian, including the eleven paintings listed in the attachment to the Act of Sale as well as all other artwork in the Smithsonian's possession, was filed on July 18, 1989. In this action, the plaintiff has sued two individual defendants in their official capacities as well as the Smithsonian Institution.

The plaintiff has also filed a civil action against the Smithsonian in the Tribunal de Grande Instance in Paris, France. In that action, plaintiff claims to have purchased eleven paintings by Ms. Brooks under the 1966 Act of Sale. The complaint in that action only claims ownership of those paintings listed in the appendix to the Act of Sale. This action is still pending in Paris.

### The Plaintiff's First Amended Complaint

Count I of the plaintiff's first amended complaint alleges that a contract or contracts of bailment were entered into between Ms. Brooks and the Smithsonian pertaining to the twenty-four paintings and thirty-seven drawings. Plaintiff alleges that upon Ms. Brooks' death, he was entitled to possession of this property and, as such, became successor-in-interest to the bailment contract between Ms. Brooks and the Smithsonian. According to the plaintiff, the bailment contract was breached by the Smithsonian when it refused, on July

20, 1983, to return certain paintings to the plaintiff.

Count II alleges that in 1983, an implied-in-fact bailment contract was entered into between the plaintiff and the Smithsonian. The plaintiff alleges that the contract arose when the plaintiff provided the Smithsonian with notice that he was the true and rightful owner of certain paintings in the Smithsonian's possession pursuant to the Sale Agreement.

Count III of the first amended complaint alleges that the plaintiff is the lawful owner of the paintings and drawings and that the property was taken with neither due process nor just compensation, as required by the Fifth Amendment to the United States Constitution.

Count IV states an action in replevin. In his complaint, the plaintiff alleges that the Smithsonian wrongfully possesses the artwork, with full notice that Mr. Mac'Avoy claims to be the true and rightful owner of the paintings and drawings and has an immediate and superior right of possession. The plaintiff alleges that such actions by the Smithsonian amount to a wrongful detention of the plaintiff's personal property which is actionable in replevin.

Count V of the plaintiff's first amended complaint alleges that the Smithsonian acted in a manner contrary and violative of its own administrative policies, procedures and internal guidelines for the normal acquisition and acceptance of works of art, and the statute authorizing the Smithsonian to accept gifts into its museums, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

Count VI of the first amended complaint alleges that prior to the Sale Agreement, Ms. Brooks sent five paintings to the Smithsonian subject to certain conditions that have not been satisfied. This amounted to a breach of express contract. Accordingly, the plaintiff asks the Court to return the five paintings to the plaintiff in his capacity as curator of Ms. Brooks' works. The plaintiff alleges that, under

French law, as curator, the plaintiff acquired the right to determine the most appropriate treatment of these works. Furthermore, the plaintiff alleges that the plaintiff's curator rights extend to any other paintings and/or drawings Ms. Brooks sent to the Smithsonian after the Sale Agreement.

As a remedy, the plaintiff asks for a declaration that the plaintiff is the true and rightful owner of all of the paintings and drawings by Ms. Brooks currently in the possession of the Smithsonian and an order that such paintings and drawings be returned immediately.[3] The plaintiff also asks the Court to declare the plaintiff to be the curator of the five paintings Ms. Brooks sent to the Smithsonian before the Sale Agreement, as well as any other paintings or drawings that the Court does not determine to be owned by the plaintiff. Further, the plaintiff seeks $9,000 in damages.

### Discussion

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact." While summary judgment is to be granted if there is no *genuine* issue of *material* fact, it is precluded if there exists a factual dispute that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The governing substantive law identifies which facts are material. *Id.* In order to defeat the defendants' motion to dismiss these claims, the plaintiff must "make a showing sufficient to establish the existence of an element essential to" each of his individual claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With these standards in mind, the Court

---

**3.** There are currently 18 paintings and 41 drawings by Romaine Brooks currently in the possession of the Smithsonian.

shall address each count of the plaintiff's first amended complaint.

### The Bailment Counts

In Counts I and II of the plaintiff's first amended complaint, he seeks to characterize the transactions between Ms. Brooks and the Smithsonian and between himself and the Smithsonian as bailment contracts. The facts adduced through extensive discovery both in the United States and in France, however, fail to support this characterization.

■ Bailments are defined by state law. Therefore, the Court is compelled to look to the law of the District of Columbia to determine whether a bailment exists. The District of Columbia Court of Appeals has held that a bailment requires a delivery by the bailor and the acceptance by the bailee of the subject matter of the bailment. *Dumlao v. Atlantic Garage, Inc.*, 259 A.2d 360 (D.C.App.1969). The bailee does not acquire title to the property but merely holds the property according to the terms of the bailment. A bailment is a form of contract and, thus, requires the mutual consent of the parties. There must be a "meeting of the minds," so to speak. Other states, as well, have addressed the particular requirements of a bailment contract. In *H.S. Crocker Co. v. McFaddin*, 148 Cal.App.2d 639, 307 P.2d 429 (1957), the court held that "the general rule that the assent of both parties is necessary before a contract, either express or implied in fact, can come into existence, is applicable to the ordinary case of a contract of bailment." *Id.* 307 P.2d at 432. If there is no express agreement, an implied in fact bailment can be found only if it appears from the circumstances that such was the intent of the parties. *Id.* at 433. "No bailment can be implied where it appears it was the intention of the parties ... that the property was to be held by the party in possession in some capacity other than as bailee." *Id.*

■ In this case, the undisputed evidence establishes, at the very least, that there was no assent to any type of bailment arrangement on the part of the Smithsonian. Ms. Brooks is dead and, therefore, it is difficult to determine what her intent was.[4] Documentary evidence, on the other hand, does present a picture of Ms. Brooks' intent. After each shipment of paintings or drawings, the Smithsonian acknowledged the shipments as "gifts." Ms. Brooks never responded to the contrary. Instead, she continued to ship her artwork to the Smithsonian. Further, when some of the artwork was shipped to the United States from France, the documents reflected a permanent, rather than a temporary export of the artwork.[5]

Even if Ms. Brooks' intention concerning the artwork *were* questionable, the intention on the part of the Smithsonian and its representatives is clear. Only two Smithsonian representatives who were involved in the acquisition are still living. Both testified that it was their understanding that the paintings and drawings were gifts from Ms. Brooks to the Museum.

Letters acknowledging the receipt and acceptance of the artwork indicate that the Smithsonian understood the transaction to be a gift rather than a loan. Therefore, even if Ms. Brooks considered the artwork to be on loan, no bailment contract can be established without there being a similar understanding on the part of the Smithsonian. The evidence establishes that the Smithsonian did not understand the paintings or drawings to be loans from Ms.

---

**4.** The plaintiff points to evidence of other transfers of art made by Ms. Brooks to other museums prior to her dealings with the Smithsonian in which she documented the transfers as gifts by executing various legal documents. However, the plaintiff can point to no evidence concerning the transfer to the Smithsonian evidencing Ms. Brooks' intent to bail or loan the artwork to the Smithsonian.

**5.** When the artwork was shipped to the United States from France, the export documentation indicated a permanent, rather than a temporary, export of the artwork. *See* Defendants' Exhibit 41. Even the plaintiff testified that French Customs requires forms such as those in Defendants' Exhibit 41 to be filed before works of art can be removed from the country. The designation on the papers, "Exportation Definitive," indicates that the works were exported permanently from France.

Brooks. Since the Court finds that there was no meeting of the minds, there was no bailment contract between Ms. Brooks and the Smithsonian. Therefore, the Court shall grant summary judgment in favor of the defendant on Count I of the plaintiff's first amended complaint.

 The same analysis applies to the alleged bailment contract between the plaintiff and the Smithsonian alleged in Count II of the plaintiff's first amended complaint. Even if the plaintiff asserts that it was his intent to create a bailment between himself and the Smithsonian, the lack of Smithsonian's accession is sufficient to negate a bailment contract. Further, in the case of Count II, the plaintiff fails to present an even plausible explanation of his 1983 letter demanding the return of the artwork in light of this ingenious bailment theory.

In 1983, the plaintiff notified the Smithsonian that he claimed the artwork as his own and demanded the return of at least eleven of the paintings. The Smithsonian's rejection of his claim to the artwork and its refusal to provide the plaintiff with the paintings evidences that there was no "meeting of the minds" as to the alleged bailment contract. Neither the plaintiff nor the Smithsonian intended there to be a bailment of the artwork.

The plaintiff's self-serving contention that, after his claim to the paintings was rejected by the Smithsonian, he "then consented to the Smithsonian's continued possession" is not only unconvincing; it is preposterous. This contention alone cannot establish evidence sufficient to survive summary judgment when all of the surrounding objective facts compel the conclusion that the plaintiff never agreed to allow the Smithsonian to continue holding the paintings.

The plaintiff argues that the Smithsonian's response to the plaintiff did not "unequivocally repudiate the plaintiff's claim

of ownership." The Court cannot imagine the Smithsonian's response being any more unequivocal. The Museum Director wrote, "All of these paintings, except for one, are owned by the National Museum of American Art of the Smithsonian Institution and were given to this museum by Ms. Brooks many years ago." *See* Defendants' Exhibit 29. The letter from the Smithsonian's Assistant General Counsel was equally unequivocal. The Assistant General Counsel wrote, "It is evident that Mrs. Brooks considered these works hers to give in 1968 and 1970, respectively, and that she in fact gave them to our museum. *Accordingly, the museum reaffirms its ownership of these ten paintings.*" *See* Defendants' Exhibit 30. (emphasis added)

The plaintiff has been unable to point to any evidence suggesting that the Smithsonian assented to the alleged implied-in-fact bailment contract.[6] Although the Smithsonian frequently corresponded with Ms. Brooks about a planned exhibition of her work, this does not preclude the conclusion that the Smithsonian intended to mount the exhibition with works it considered to be its own. Therefore, the Court shall grant summary judgment in the defendant's favor on Count II of the plaintiff's first amended complaint.

### The Replevin Count

The essence underlying all of the plaintiff's claims is that the Smithsonian is in possession of certain paintings and drawings which were taken without authority and that the Smithsonian refused to the alleged true and rightful owner, namely, the plaintiff. Count IV of the plaintiff's first amended complaint alleges that the Smithsonian's actions in continuing to refuse to return the artwork amount to a "wrongful detention" of the plaintiff's personal property which is actionable in replevin.

---

**6.** Although the plaintiff points to some early transactions between Ms. Brooks and the Smithsonian in which Ms. Brooks indicated that she wished to donate to the National Gallery of Art several paintings, the donative language used by Ms. Brooks in that correspondence in 1948 does not preclude Ms. Brooks from making the donation in 1966 without that specific donative language.

Replevin has been described as a "remedy to recover possession of property wrongfully taken and detained, together with damages incident merely to the detention." *Wardman–Justice Motors, Inc. v. Petrie*, 39 F.2d 512, 515 (D.C.App.1930). The claim asserted in Count IV of the plaintiff's first amended complaint sounds in the tort of replevin or in the tort of conversion.[7]

Conversion has been described as a "wrongful deprivation of property which the plaintiff is entitled to possess." *Commercial Credit Corp. v. University National Bank of Fort Collins*, 590 F.2d 849, 852 (10th Cir.1979). In his complaint, the plaintiff alleges that there has been a "wrongful detention" of his property, suggesting a claim in conversion rather than in replevin.[8]

An action in replevin or conversion can be maintained regardless of how the defendant initially acquired the property. The defendant may have acquired the property through either lawful or unlawful means. The acquisition of the property is immaterial to a claim in replevin or conversion. The essence of the actions is the wrongful withholding of the property in question. As this Court has held before, the action for replevin, *i.e.* one to recover property wrongfully appropriated, sounds in tort. *See Saddler v. D'Ambrosio*, Civil Action Nos. 88–3188, 88–2699 (D.D.C. June 28, 1990), slip op. at 11, n. 7. This is exactly what the plaintiff is seeking. Although the primary objective of the replevin action (*i.e.* the restoration of possession of property) is different from the traditional tort remedy (*i.e.* money damages), this does not necessarily preclude the classification of replevin as a tort. "Although [actions in replevin] are restitutionary in char-

acter, they are [nonetheless] classified as tort actions." *Ablah v. Eyman*, 188 Kan. 665, 365 P.2d 181, 190 (1961). Given that the plaintiff's allegations suggest a claim for conversion rather than replevin and the fact that even replevin, as a restitutionary action, can still be considered a tort, the Court holds that the plaintiff's claim for replevin is an action in tort.

Properly characterizing the plaintiff's claim as a tort, it becomes clear that this Court lacks jurisdiction over the plaintiff's claim in Count IV.

It is well settled that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued, ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981), *quoting United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), *quoting United States v. Sherwood*, 312 U.S. 584, 586–87, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). Where the United States waives its immunity from suit, "limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." *Lehman v. Nakshian*, 453 U.S. at 161, 101 S.Ct. at 2702, *quoting Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957).

Tort claims against the United States, including the claim alleged in Count IV of the plaintiff's first amended complaint, are governed by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). *See Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution*, 566 F.2d 289, 296 (D.C.Cir.1977), *cert. denied*, 438

---

**7.** Although the plaintiff's first amended complaint speaks in terms of determining superior title, all of the allegations of the complaint suggest that the plaintiff is actually alleging a claim for conversion. Artful pleading will not avoid the jurisdictional limitations placed on the plaintiff's claim which rings true as a claim in tort.

**8.** This is further supported by the fact that even if the plaintiff could establish that a bailment contract was entered into by Ms. Brooks and the

Smithsonian or himself and the Smithsonian, the cause of action which would arise from the breach of such a contract would be an action in conversion. *See Fotos v. Firemen's Insurance Company of Washington, D.C.*, 533 A.2d 1264, 1267 (D.C.App.1987) ("A bailee's unauthorized transfer of goods in breach of a bailment contract is an 'exercise of ownership, dominion and control' inconsistent with the bailor's rights, and thus constitutes a conversion.")

U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). The FTCA constitutes a limited waiver of sovereign immunity and permits the recovery of damages in tort suits brought against the United States within the confines of the terms and conditions imposed by the statute. The plaintiff has failed to satisfy certain prerequisites to suit under the FTCA and, therefore, the Court lacks jurisdiction to entertain the claim alleged in Count IV of the plaintiff's first amended complaint.

The FTCA specifically sets out certain prerequisites to filing a tort claim against the United States. First, the FTCA specifically provides that an action cannot be maintained in district court unless the claimant has filed a timely administrative claim. This prerequisite is jurisdictional and must be strictly construed. *See Walters v. Secretary of Defense*, 725 F.2d 107 (D.C.Cir.1983) (in any suit against United States, statute of limitations is integral part of government's consent to suit•and as such is issue of subject matter jurisdiction which cannot be waived). No such claim has been filed in this action.[9]

It is now too late for the plaintiff to file an administrative claim against the Smithsonian since a tort claim against the United States is "forever barred" unless an administrative claim is presented within two years of the date on which the claim accrued. 28 U.S.C. § 2401(b). A claim accrues under the FTCA no later than the time that a claimant discovers, or in the exercise of due diligence should discover, the fact that he has been injured and the cause of the injury. *See United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 359, 62 L.Ed.2d 259 (1979).

Defendant's letters to the plaintiff in July and September, 1983, at the very latest, made the plaintiff aware that the Smithsonian claimed ownership of the artwork and refused to return the paintings and/or drawings to the plaintiff. Despite this notice, the plaintiff did not file his cause of action in district court until almost six years later. An almost identical situation arose in *Magruder v. Smithsonian*, 758 F.2d 591 (11th Cir.1985). In that case, the Smithsonian received an art object in 1932 from Marshall Magruder as a gift "on behalf of his son," who was a minor. In June 1974, the son wrote to the Smithsonian stating that he had just discovered a letter to his father from the Smithsonian thanking him for the gift of the object and that he understood that the object had only been loaned to the Smithsonian. In response to this letter, the Smithsonian refused his request and asserted that it had acquired the object as a "good faith gift."

The son did not respond to the Smithsonian's 1974 letter until five years later when his attorney wrote the Smithsonian asserting the son's ownership and demanding the return of the object.

In a subsequent action filed in federal court, the court found that the son's cause of action accrued no later than 1974, when he became aware of the Smithsonian's claim of ownership. His claims were, therefore, barred by the two-year statute of limitations.

The same is true of the case before the Court here. The plaintiff was notified by letter both from Smithsonian representatives and counsel for the Smithsonian that the Smithsonian claimed ownership of the artwork. Nothing could be more unequivocal. Yet, still, the plaintiff did not file a claim for the paintings and drawings until July 1989. Although the Court appreciates the fact that the plaintiff resides in a jurisdiction with a much longer statute of limitations, this does not excuse his failure to respond for six years. Litigative timidity is not a sufficient justification for ˀn unreasonable delay in pursuing one's claims. *Welcker v. United States*, 752 F.2d 1577 (D.C.Cir.), *cert. denied*, 474 U.S. 826, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985).

Since the Court holds that the plaintiff's action for replevin contained in Count IV is

---

**9.** The Court does not accept the plaintiff's characterization of Mr. Schnerb's January 1989 inquiry with the Smithsonian on the plaintiff's behalf as an administrative claim still pending.

Further, even if the Court were to consider this inquiry an administrative claim, Mr. Schnerb's inquiry does not fall within the FTCA's two-year statute of limitations.

a tort action and since the plaintiff failed to file an administrative claim within the two-year statute of limitations imposed by the FTCA, the plaintiff's replevin action alleged in Count IV of the plaintiff's first amended complaint must be dismissed for lack of jurisdiction.

### The Fifth Amendment Count

In Count II of his first amended complaint, the plaintiff alleges that the defendants engaged in an unconstitutional taking of private property without due process and without just compensation in violation of the Fifth Amendment. Both claims must be dismissed as failing to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

■ In asserting his due process claims directly under the Fifth Amendment to the United States Constitution, the plaintiff seeks to recover despite the availability of a tort remedy under the FTCA. He relies on *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and its progeny. *Bivens*, which only allowed for money damages against federal officials in their individual capacities, allows suits to be brought for alleged violations of the United States Constitution. However, the *Bivens* doctrine does not apply to lawsuits brought against the federal government[10]:

> [I]nsofar as [the plaintiff] relies on Section 1331 to establish federal jurisdiction for a suit involving a constitutional tort following the rationale of *Bivens* ..., it is mistaken precisely because there is no waiver of sovereign immunity. *Bivens* authorizes suit against the responsible federal official ... not against the government itself, ... and *Bivens*-type actions against the United States are, as the district court noted, routinely dismissed for lack of subject matter jurisdiction.

*Keene Corporation v. United States*, 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Since the plaintiff has not sued the two individual defendants in their individual capacities and *Bivens* does not allow damage actions based on constitutional claims against the federal government, the plaintiff's damages actions under *Bivens* must be dismissed.

■ Remaining, then, is the plaintiff's claim for injunctive relief which is not specifically precluded by *Bivens*. *See Spagnola v. Mathis*, 859 F.2d 223, 230 (D.C.Cir. 1988). However, in making this claim for injunctive relief, the plaintiff must still prove that he was deprived of his property *without due process of law*. In proving his procedural due process claim, the plaintiff must prove that the procedures available were not merely insufficient or even inadequate. They must be *constitutionally* inadequate. The procedures available must "contain a defect so serious that we can characterize the procedures as fundamentally unfair, a defect so basic that we are forced to conclude that the deprivation occurred without due process." *Daniels v. Williams*, 474 U.S. 327, 341, 106 S.Ct. 662, 680, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring).

The availability of a tort remedy such as that offered under the FTCA is generally sufficient to satisfy due process. *See Hudson v. Palmer*, 468 U.S. 517, 536, 104 S.Ct. 3194, 3205, 82 L.Ed.2d 393 (1984). Although an FTCA claim would only allow the plaintiff to recover money damages and not the paintings themselves, this does not make the process fatally deficient. An alternative remedy is not constitutionally deficient even if it provides less relief than that available under the Constitution. *See Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 2417, 76 L.Ed.2d 648 (1983). In *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Supreme Court ruled, in the *Bivens* context, that it would not create a *Bivens* remedy despite the fact that the alternative remedy did not provide complete relief for the

---

**10.** The two individually-named defendants in this action are sued in their representative ca- pacities and not in their individual capacities.

plaintiffs. *Id.* at 2467. *See also Bush v. Lucas,* 103 S.Ct. at 2417; *Spagnola v. Mathis,* 859 F.2d at 229. The Court made clear that it was the comprehensiveness of the statutory scheme at issue and not the completeness of specific remedies thereunder that is determinative of whether a separate remedy, such as *Bivens,* should be created by the courts. *Schweiker v. Chilicky,* 108 S.Ct. at 2467. All of these decisions rested on the concept that there are special factors counseling hesitation in the absence of affirmative action by Congress. Here, Congress has created the FTCA, a comprehensive scheme for recovering tort damages against the United States. Congress specifically did *not* authorize the courts to grant injunctive relief under the FTCA. The plaintiff here has chosen not to take advantage of the remedy offered by the FTCA. This is certainly the plaintiff's prerogative. However, this failure to take advantage of an available statutory remedy offering recovery cannot stand as a basis for bringing a constitutional claim under the Fifth Amendment. A process was, indeed, afforded the plaintiff. The Court appreciates the plaintiff's concern that the process available under the FTCA will not allow the recovery of the paintings themselves. However, the mere fact that the plaintiff is unable to recover exactly what he wants is an insufficient basis for finding a denial of constitutional due process. Congress has addressed the type of recovery allowed for such actions alleged by the plaintiff. Whether or not the Court believes that Congress' response is the best response, Congress is the body charged with waiving sovereign immunity and providing for remedies for torts allegedly committed by the government through its officials. The statutory scheme is complete and the remedy provided, albeit somewhat insufficient in the unique case before the Court, is not so deficient to constitute a denial of due process under the Fifth Amendment to the United States Constitution. Therefore, the Court must dismiss the plaintiff's due process claim for failing to state a claim upon which relief can be granted.

As for the plaintiff's claim under the Takings Clause under the Fifth Amendment, the Court must dismiss this claim as well. A prerequisite to a claim under the Takings Clause is proof of the government's lawful authority to take the property. Here, the plaintiff repeatedly asserts that the Smithsonian took the property unlawfully and without lawful authority. The plaintiff's claims, sounding in tort, do not fall within the scope of the Fifth Amendment's Takings Clause.

> In other words, the Government must have lawfully used its power in converting private property to public use.... Consequently, the Government official or agency that appropriated private property must have acted within its authority.... An unauthorized or unlawful taking is not compensable under the fifth amendment, but is a claim sounding in tort.

*Adams v. United States,* 20 Cl. Ct. 132, 137 (Cl.Ct.1990).

Further, the plaintiff has failed to prove that the Smithsonian intended to take the plaintiff's paintings. He has failed to demonstrate that the invasion of his property rights was the natural and probable result of the defendant's actions. *See Baird v. United States,* 5 Cl.Ct. 324, 330 (Cl.Ct. 1984). Again, this prerequisite for a Takings Clause claim aims to distinguish Takings Clause claims from ordinary torts. Under this standard:

> [I]t is the likelihood of the outcome of the government's action that distinguishes its takings from its torts.... Essentially, therefore, the probability and foreseeability of the damage is a primary determinative element in whether a taking or tort occurred.

*Id.*

As the plaintiff concedes and the facts indisputably prove, the Smithsonian did not know of the plaintiff's interest in the artworks sent by Ms. Brooks at the time it received them. Given the Museum's understanding that it was receiving the paintings and drawings as gifts, there is no basis for the conclusion that the alleged interference with the plaintiff's property rights was the

natural and logical consequence of the Museum's acquisition of these works.

Given the plaintiff's failure to prove either the Smithsonian's intent or lawful authority, the Court shall dismiss the plaintiff's Takings Clause claim as failing to state a claim upon which relief can be granted.

### Plaintiff's APA Claims

In Count V, the plaintiff alleges that the Smithsonian acted in a manner that is contrary to and violative of its own administrative policies, procedures and internal guidelines for the formal acquisition and acceptance of works of art and also violated the statute authorizing the Smithsonian to accept gifts into its museums. The plaintiff seeks judicial review under the APA's arbitrary and capricious standard.

The plaintiff alleges that the Smithsonian purported to acquire title to the artwork while making no investigation into whether the person from whom they allegedly acquired title had the authority to convey it and that the Smithsonian failed to adhere to a pre-existing and subsequent practice of clarifying issues of title by supplying form letters or formal deeds of gift for potential donors to sign. However, after extensive discovery, the plaintiff can point to no evidence that the National Gallery of Fine Art, the Museum dealing directly with Ms. Brooks, had any practice of clarifying issues of title by requiring formal deeds of gift. However, even if there *did* exist a formal procedure for making donations to the Smithsonian, the plaintiff's APA claims must be dismissed for lack of standing.

The Supreme Court has established a two-prong test for standing under the APA. First the plaintiff must prove that he has suffered an "injury in fact" as a result of the challenged action. *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). Second, the plaintiff must show that the injury was to an interest within the "zone of interests" sought to be protected by the relevant statute or regulatory provision claimed to be violated. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

As for the first prong, the plaintiff's allegations of injury in fact are too hypothetical to establish standing under the APA. The plaintiff claims that if the Smithsonian had conducted an investigation into Ms. Brooks' title, and if the Museum had acted upon its knowledge that it was dealing with an elderly woman whose affairs may have been looked after by others, and if the Smithsonian had developed a policy requiring deeds of gift from potential owners, and if the Museum's acquisition procedures had called for a more detailed review of the artwork, then the Smithsonian may have learned of the plaintiff's Act of Sale with Ms. Brooks. This amounts to no more than speculation, especially given the fact that the Smithsonian had no formal policy in place—that is, no formal policy which it could arbitrarily and capriciously violate. The plaintiff's allegations are insufficient to establish standing under the APA. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983) ("Abstract injury is not enough.... [T]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'")

Since the plaintiff fails to meet even this first prong of standing under the APA, the plaintiff's APA claim, contained in Count V shall be dismissed for failure to state a claim upon which relief can be granted.

### Plaintiff's Curator Claim

Finally, in Count VI, the plaintiff seeks relief in his alleged capacity as a "curator" of Ms. Brooks' works. He seeks to recover five paintings that were given to the Smithsonian prior to the execution of the 1966 Act of Sale and any paintings and/or drawings that the Court decides are not owned by the plaintiff or the Smithsonian. He asserts that the Smithsonian has shown a disregard for Ms. Brooks' wishes and that he, as curator of her works, is exercising her moral rights to the art.

The plaintiff's curator claim finds its basis in French law. However, the plaintiff fails to provide any admissible expert testimony as to the applicability of the appropriate French law to his claim here.[11]

Further, the defendants' expert has testified that an artist's moral rights to disposition of his or her art can only be passed by will or intestacy. Since the plaintiff does not claim to have received any rights under Ms. Brooks' will, his reliance on French law concerning an artist's moral rights is misplaced. Absent any admissible evidence to the contrary, this Court shall grant the defendant's motion for summary judgment as to Count VI, the plaintiff's curator claim.

### Conclusion

For the reasons set forth above, this Court shall dismiss Counts III and V for failure to state a claim upon which relief can be granted and shall grant defendant's motion for summary judgment as to Counts I, II, IV and VI.

---

**11.** The plaintiff, in his opposition to defendant's motion to dismiss, cited the testimony of an "expert witness" in French law. However, plaintiff's counsel expressly stated at this expert's deposition that his testimony was not being offered as expert testimony on the curator claim. Further, the witness offered by the plaintiff stated that he had "not really attempted to master the field," thus precluding him being offered as a French law expert on the curator claim.